187 So.2d 217 (1966)
Conrad C. EVERS, Plaintiff and Appellee,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY et al., Defendants and Appellants.
No. 1693.
Court of Appeal of Louisiana, Third Circuit.
June 2, 1966.
*218 McBride & Brewster, by William H. McBride, Lafayette, Arceneaux & Beslin, by Denald H. Beslin, Rayne, for defendants-appellants.
Simon, Trice & Mouton, by Phil Trice, Lafayette, for plaintiff-appellee.
Before TATE, CULPEPPER and HOOD, JJ.
HOOD, Judge.
Plaintiff, Conrad C. Evers, sues for damages for personal injuries allegedly sustained by him as a result of a motor vehicle collision. The defendants are Robert Carl Andrus, the owner of one of the automobiles involved in the collision, and his liability insurer. The case was tried by jury and resulted in a verdict for plaintiff for $6500.00. Judgment was rendered in accordance with that verdict, and defendants appealed. Plaintiff has filed an answer, demanding damages for a frivolous appeal.
*219 The defendants admit liability, but they contend that plaintiff has failed to show that he sustained any injuries at all as a result of this accident. They contend, alternatively, that the award is excessive.
The accident occurred on November 9, 1961, at an intersection of two streets in the City of Lafayette. Plaintiff was driving his employer's car at that time, and Mrs. Andrus, wife of the insured defendant, was driving the other vehicle. The Andrus car ran into the right side of plaintiff's automobile, causing the last mentioned vehicle to be knocked several feet to its left. Plaintiff at that time was driving at a speed of about fifteen or twenty miles per hour, and the Andrus car was being driven at a slightly slower rate of speed. Both vehicles were damaged as a result of the accident, but neither of them overturned and both came to rest within a few feet of the point of impact. A passenger in plaintiff's automobile sustained a fractured rib as a result of the accident.
Plaintiff is forty-one years of age. He was employed by Monsanto Chemical Company as a land man at the time of the accident, and he has continued in the same employment since that time. His duties require him to examine public records almost daily, and in doing so it is necessary for him to lift and move many large record books weighing as much as thirty-five pounds each. He also is required to do a great deal of traveling by automobile. He estimates that he drives his car between 2000 and 3000 miles each month. He has continued to perform those duties since the date of his alleged injury.
Evers testified that since the accident occurred he has suffered with severe headaches and with pain in his neck, in his shoulder blades and radiating down his left arm. He describes the pain as being "intermittent," but he says that at times it becomes "tremendous" or "extreme" or "unbearable." He states that he did not have this pain prior to the accident, and that although he has continued to perform
the duties of his employment, he has done so with this pain. He testified that he has missed some days of work because of these headaches, but he has no record of the days which he missed, and he has lost no wages or salary since the date of the accident.
Plaintiff also stated that prior to the accident he did a great deal of hunting, fishing and swimming, but that since that time he has had to discontinue hunting altogether and it has been necessary for him to greatly curtail his fishing and swimming activities because of the injuries which he received. He testified that he experiences severe pain in his neck and arm when he tries to engage in any of these sports.
About one month prior to the date of this accident, plaintiff consulted Dr. C. J. Brown, his company doctor, about a condition which he thought was a "crick" in his neck. He was treated by Dr. Brown for that condition on three occasions prior to the date of this accident. On October 27, 1961, which was about two weeks before he sustained the injuries which form the basis of this suit, x-rays were taken at the request of Dr. Brown which showed a narrowing of the space between the fifth and sixth cervical vertebra, and a calcium deposit or arthritic changes about the lips of the vertebra at this interspace. Dr. Brown did not testify at the trial, but plaintiff states that the neck symptoms which were treated by Dr. Brown had disappeared before November 9, 1961.
The accident occurred about 7:30 a. m. on a Thursday. Plaintiff worked the rest of that day and all of the next day in the Lafayette area, using another automobile, and he returned to his home in New Orleans Friday night. He states that he felt so sore the following morning that he cancelled a dove hunt which he had planned for that day. He resumed his regular duties the following Monday morning, however, and he has continued to perform those duties since that time, except for a period of about one week in 1962 when he was hospitalized. He states that since the date *220 of the accident he has suffered "intermittently" with severe headaches and with pain in his neck and radiating down his left arm while he was working.
Immediately after the accident occurred, Evers informed the investigating police officer that he had not been injured. Later that same day, he told Mrs. Andrus that he had sustained no injury. And, on December 4, 1961, or approximately one month after the accident occurred, he informed a representative of the defendant insurer that he had not been hurt in the accident, and he signed a statement to that effect.
Plaintiff did not seek medical attention until sometime in February, 1962, when he consulted his regular "eye doctor," believing that his headaches were caused by eye strain. The treatment administered to him on that visit, however, failed to give him relief from these headaches. During the next few months he consulted at least seven other doctors, including an orthopedic surgeon, a nerve specialist, a physiotherapist, and some internal specialists, in an effort to obtain relief from his symptoms. In April or May, 1962, he was hospitalized for one week for diagnostic purposes, and thereafter he received treatment consisting principally of traction and physiotherapy. He states that this treatment also failed to relieve him of the pain which he suffered.
On October 30, 1962, plaintiff was examined by Dr. Blaise Salatich, an orthopedic surgeon, and he was treated by that doctor for several months thereafter. He also was examined by Dr. Jose L. Garcia-Oller, a neurological surgeon, on March 6, 1963, by Dr. John D. Jackson, also a neurological surgeon, on August 26, 1963, and by Dr. Hyman R. Soboloff, an orthopedic surgeon, on two occasions, on August 26, 1963, and on September 7, 1965.
The medical evidence consisted solely of the testimony of the four last named doctors. Dr. Salatich testified in person at the trial. The other three medical experts testified by deposition, and their depositions were read to the jury. The doctors who examined or treated plaintiff prior to the time he first consulted Dr. Salatich were not called as witnesses and did not testify.
Dr. Salatich treated plaintiff from October 30, 1962, until May 21, 1963, and he examined him on three occasions thereafter, on September 14, 1964, on February 15, 1965, and on September 13, 1965. He concluded that plaintiff had sustained an "injury of the periarticular capsular ligamentous and muscular fascial structures of the neck," a "stretched-type left cervical nerve root injury," a possible disc injury, a cerebral concussion of short duration, a contusional injury of the right lower leg, and a "postraumatic emotional debility and instability." The doctor felt that these injuries resulted from the accident which occurred on November 9, 1961, and that they were of a permanent nature. He testified that plaintiff's symptoms relating to the neck were "approaching the chronic and static stage," that the severe headaches, neck pain and pain radiating down his arm were of such a nature that they would tend to "come and go," and that plaintiff would "have to live with that condition for the rest of his life."
The treatment administered by Dr. Salatich consisted of muscle relaxants, traction applied to the neck and the fitting and wearing of a cervical collar. Plaintiff had a traction apparatus installed in his bedroom, and he states that he used it to apply traction to his neck and that he wore the prescribed cervical collar intermittently while he was traveling in his car. While he was treating Evers, Dr. Salatich referred him to Dr. Jose L. Garcia-Oler, a neurological surgeon, for examination.
Dr. Garcia-Oller examined plaintiff on March 6, 1963, and concluded that he had sustained an acute cervical sprain and a neuralgia of the sub-occipital nerve. The doctor felt that the cervical sprain, consisting of a tearing of ligaments about the neck, was the cause of the pain which plaintiff *221 experienced in his neck, shoulders and upper extremities. The neuralgia of the suboccipital nerve, he states, is an inflammation of a chronic type which develops as a result of a stretching of the nerves resulting "from such things as the impact of an accident," and that it accounts for Evers' symptoms of pain in the back of the neck and for his headaches centering behind the eye. In his opinion, the pain and discomfort which plaintiff now experiences resulted from the accident which occurred in November, 1961, and that his injuries are of a permanent nature. He testified:
"` * * * I believe he has a permanent disability from the accident in the nature of recurrent pain and neck stiffness which would incapacitate him on an average of once every ten days, as a guess. His attacks of pain behind the eye and head we classify as moderately severe once a week, at the time of my examination. I think it's fair to say that they would tend to recur on an average of one out of every ten days, so I feel there is a certain amount of permanent disability in Mr. Evers due to this accident that he described."
Dr. Jackson, who examined plaintiff on one occasion about twenty-one months after the accident occurred, was unable to find any objective neurological reason for his complaints. An x-ray examination made by him at the time of that examination revealed some narrowing of the space between the fifth and sixth cervical vertebra, but Dr. Jackson found that the narrowing was "minimal" and that alignment was good. He conceded that an automobile collision such as the one in which plaintiff was involved could cause a tearing of the ligaments in the neck, and that such an injury could produce the symptoms of which plaintiff complains. He felt, however, that if Evers had sustained that type of injury at the time of the collision he would have suffered severe pain and would have sought medical attention immediately after the accident occurred. He found no signs of torn ligaments or other neck injury, and he concluded that plaintiff did not have a disabling injury at the time of that examination.
Dr. Soboloff, after examining plaintiff on two occasions, could find nothing objective from an orthopedic standpoint to substantiate plaintiff's complaints of pain. There was no spasm and no atrophy of any of the muscles. X-rays taken at the time of that examination revealed a normal alignment of the bony structures with no evidence of bony injury, except for small osteophytes of the fifth cervical vertebra, which we assume is the same condition which was shown in x-rays taken before the accident. He stated that an automobile collision, such as that in which Evers was involved, could have caused a tearing of ligaments in the neck and that such an injury could be of a permanent nature. He, like Dr. Jackson, however, was of the opinion that plaintiff would have suffered severe pain immediately after the accident if he had sustained a ligamentous tear, and that he would have sought medical attention immediately.
It is apparent from the foregoing that both the medical and the lay testimony is conflicting as to whether plaintiff actually sustained an injury as a result of the accident which occurred on November 9, 1961, or as to whether his present complaints are causally related to that accident, or as to the nature and extent of such injuries. The jury obviously concluded that plaintiff did sustain serious injuries as a result of that accident, since a substantial award of damages was made.
Defendants argue that since the testimony of some of the doctors to whom plaintiff voluntarily went for examination or treatment after the accident occurred was not produced by plaintiff, and since no explanation was given as to why their testimony was not obtained, the presumption arises that the statements of each of these doctors would have been unfavorable to *222 plaintiff. We agree that an inference unfavorable to plaintiff does arise because of his failure to call these witnesses. Stockstill v. Barge Thompson Corporation, et al, La.App. 4 Cir., 184 So.2d 98; Cloud v. National Surety Corporation, La.App. 3 Cir., 166 So.2d 31; Brown v. Yellow Cab Company of Shreveport, Inc., La.App. 2 Cir., 94 So.2d 573. Although this unfavorable presumption is a factor to be considered with the other evidence in determining the true facts, it alone is not sufficient to outweigh or to overcome the positive, sworn testimony of the examining and treating physicians whose testimony was obtained and produced at the trial. Pierre v. Galloway, La.App. 1 Cir., 96 So.2d 916 (cert. denied); Turner v. Southern Industries Company, La.App. 1 Cir., 88 So.2d 238 (cert. denied); Thomas v. Fidelity & Casualty Company of New York, La.App. 4 Cir., 136 So.2d 824; Pilcher v. Standard Accident & Insurance Company, La.App. 1 Cir., 122 So.2d 675.
It is argued that the fact that plaintiff did not seek medical attention until several weeks after the accident occurred disproves his claim that he sustained serious injuries in that accident. Plaintiff explained that shortly after the accident occurred he told the investigating officer and Mrs. Andrus that he was not injured because he was upset over the accident and he did not realize that he had been injured until the following day. He says he was suffering from headaches and aching in his left arm when he made a similar statement to the insurance adjuster a month later, but that he did not know at that time that this pain was related to the accident. Dr. Salatich testified that in injuries of this type patients frequently delay seeking medical attention for weeks or months, and he is confirmed in that statement to some extent by Dr. Garcia-Oller, who stated that patients with cervical spasms which are not severe but which produce chronic symptoms frequently do not seek medical treatment until some time after the injury is sustained. The jury obviously accepted the explanations given by plaintiff and these two doctors as to why he did not seek treatment immediately.
Defendants contend, finally, that the fact that plaintiff stated on three occasions after the accident occurred that he had not been injured, considered with other evidence and presumptions unfavorable to him, show that plaintiff's present complaints are not attributable to the accident which occurred on November 9, 1961. We agree that these facts cast considerable doubt on the validity of plaintiff's claim. Plaintiff correctly points out, however, that the positive testimony of Dr. Salatich and of Dr. Garcia-Oller, if accepted as true, is sufficient to support a verdict for the plaintiff.
Applicable here is the well established rule that findings of fact by the trial court or jury, particularly those involving the credibility of witnesses, are entitled to great weight on appeal and that determinations made by the trial judge or jury as to the facts will not be disturbed unless found to be clearly erroneous. Hudson v. Arceneaux, La.App. 3 Cir., 169 So.2d 731; Orlando v. Polito, 228 La. 846, 84 So.2d 433; and Fontenot v. Snow, La.App. 3 Cir., 149 So.2d 172. In the instant suit, since two of the medical experts whose testimony appears in the record feel that plaintiff did sustain an injury as a result of the accident, and that there was a causal relationship between the accident and plaintiff's present complaints, we cannot say that the jury erred in accepting their testimony and concluding that plaintiff did sustain the injuries of which he complains as a result of the accident which formed the basis for this suit.
We now consider defendants' alternative argument that the award made by the trial court is excessive.
Plaintiff did not lose any wages as a result of the injuries which he sustained in this accident. He testified that he incurred medical expenses amounting to between *223 $800.00 and $1000.00 for the treatment of these injuries.
As we have pointed out, the treating orthopedist and an examining neurosurgeon testified to the effect that plaintiff sustained permanent injuries as a result of this accident, that these injuries will cause him to suffer severe headaches and pain in his neck and upper extremities at intervals as often as every ten days during the rest of his life, and that the pain is of such severity that at times it disables him. Their testimony also supports plaintiff's statements that his injuries prevent him from hunting and it curtails him in engaging in such recreational activities as fishing and swimming. There is substantial evidence, on the other hand, tending to show that plaintiff's present symptoms are not causally related to the accident and that his injuries are not as serious as he contends. We have decided, however, that the jury did not commit manifest error in accepting the testimony of the two above mentioned medical experts in preference to the others who testified, and in concluding that plaintiff sustained serious and permanent injuries as a result of this accident. Under these findings, we conclude that the jury did not abuse the discretion vested in it in awarding plaintiff the sum of $6500.00 for those injuries.
Although we have concluded that the judgment should be affirmed, we have shown that there is considerable merit to the arguments presented by the appellants, and for that reason the appellee's demand for damages for frivolous appeal is denied.
For the reasons herein set out, the judgment appealed from is affirmed. All costs of this appeal are assessed to defendants-appellants.
Affirmed.