236 So.2d 906 (1970)
Alwyn Joseph BOUTTE, Plaintiff and Appellee,
v.
MUDD SEPARATORS, INC., Defendant and Appellant.
No. 3095.
Court of Appeal of Louisiana, Third Circuit.
June 25, 1970.
Rehearing Denied July 24, 1970.
*907 Davidson, Meaux, Onebane & Donohoe, by V. Farley Sonnier, Lafayette, for defendant-appellant.
Armentor, Wattigny & DeCuir, by Gerard B. Wattigny, New Iberia, for plaintiff-appellee.
Before HOOD, CULPEPPER and MILLER, JJ.
CULPEPPER, Judge.
Plaintiff seeks workmen's compensation benefits for total and permanent disability. From an adverse judgment, defendant appealed. Plaintiff answered the appeal, seeking a modification of the district court judgment to hold that plaintiff is disabled by traumatic neurosis, in addition to his physical disability.
The issues on appeal are: (1) Was plaintiff acting within the course of his employment at the time of the accident which occurred while he was driving the defendant employer's truck on the way home after working hours? (2) Is plaintiff permanently and totally disabled by diplopia (double vision)? (3) What is the effect of plaintiff's failure to call as witnesses two or three doctors who saw him? (4) Is plaintiff disabled as a result of traumatic neurosis?

GENERAL FACTS OF EMPLOYMENT AND ACCIDENT
The facts show that plaintiff was employed by Mudd Separators, Inc., as a centrifuge service man. His duties included delivery, maintenance and service of these machines which his employer leased for use on both land and sea oil wells. He was subject to call 24 hours a day and was furnished a truck and traveling expenses. It takes about 20 minutes to drive from his home to the shop in New Iberia. The truck was kept at his home at night and on week ends for use on service calls. His duties involved a lot of climbing and the use of hoisting equipment. When delivering these units to off-shore wells, he had to load them on bouncing boats and then unload them at the oil rigs.
On Saturday, April 5, 1969, plaintiff worked at his employer's shop in New Iberia until noon. His wife met him at the shop in their personal automobile and they went to lunch and then engaged in other personal affairs Saturday afternoon and returned to their home Saturday night, leaving the truck at the shop.
The next day was Easter Sunday. Plaintiff and his wife had family visitors at their home and then left about 2:30 p.m. They went first to New Iberia and then to a dance hall near Abbeville where they drank, danced and finally had something to eat about 6:30 p.m. During this period of time plaintiff testified he drank about five beers but no whisky. While at the dance hall, plaintiff called the answering service *908 of his employer to notify them of his whereabouts. When they left, plaintiff asked his father, who lives in New Iberia, to drive him there and to his employer's shop in order to pick up his truck for work the next day. On the way they stopped and drank another beer and then went to the shop where plaintiff and his wife got in the truck and started driving toward their home. On the way home, they were involved in a head-on collision and plaintiff received the injuries at issue.
Immediately after the accident plaintiff was seen by Dr. Joseph L. Comeaux, a general practitioner in New Iberia, who diagnosed a laceration of the scalp, cut on the leg and various bruises and contusions. He recovered completely except for an injury to one of the cranial nerves which supply the muscles that move the eyeball up and down and medially. As a result, the muscles which move the left eye do not function properly. When the right eye moves, the left eye "lags behind" and the result is diplopia, i.e., double vision.

WAS THE ACCIDENT IN THE COURSE OF EMPLOYMENT?
The first issue is whether the accident occurred in the course of plaintiff's employment. As a general rule, an accident which occurs while an employee is going to or returning from work is not in the course of his employment, Gardner v. Industrial Indemnity Co., 212 So.2d 452 (1st Cir. 1968) and the authorities cited therein. However, this rule is subject to a number of exceptions, one of which is that where the employee is being transported to or from work by a method which is provided under the contract of employment, the injuries are compensable. See Gardner v. Industrial Indemnity Company, supra, and Malone, La. Workmen's Compensation Law & Practice, Sec. 173.
Our jurisprudence is established that where the employee is furnished a vehicle to drive to and from work, an accident is compensable which occurs on one of these trips provided the trip is reasonably contemplated by the contract of employment as being one which the employee would make in the interest of his employer's business, Jagneaux v. Marquette Casualty Company, 135 So.2d 794 (3rd Cir. 1961); Keller v. Wallace Industrial Constructors, 224 So.2d 31 (1st Cir. 1969); Welch v. Travelers Insurance Company, 225 So.2d 623 (1st Cir.1969) writ of certiorari refused, 254 La. 852, 227 So.2d 594, Malone, La. Workmen's Compensation Law & Practice, Sec. 173.
Defendant makes a respectable argument that the trip in question here was not reasonably contemplated as being incidental to the contract of employment. Defendant concedes that if the accident had occurred while plaintiff was driving the truck from the shop to his home after he quit work at noon on Saturday, the injuries would be compensable. However, the employer says the facts here show plaintiff left his employment on Saturday and was completely outside the course thereof for a period of about 36 hours, including the time of the accident. Furthermore, defendant contends plaintiff drove the truck home Sunday for plaintiff's own convenience so that he could have the truck at home to drive to Cameron early Monday morning to meet a boat which would transport him out to an oil rig. In essence, the defense is that this trip was not at a time which was contemplated by the employment agreement nor for a purpose which served the interest of the employer.
Welch v. Travelers Insurance Company, supra, is very similar. In that case the employee was paid extra compensation to use his vehicle to transport himself and other employees to the jobsite each day. On the day in question, he obtained permission from his foreman to leave work early for the purpose of purchasing a new pickup truck. He was on his way to his motel, where he was staying temporarily while away from home on this particular job, when the accident occurred. The argument was made that since the employee *909 had left his work earlier than usual, he had deviated from the course of his employment. The court held it was contemplated by the employment agreement that Welch would take his vehicle to the motel each night and use it the next day to transport himself and the other employees in furtherance of his employer's business. Hence, the trip to his motel after work although not at the usual time, was within the course of his employment.
In Keller v. Wallace Industrial Constructors, supra, the employee was working on a construction job in Taft, Louisiana. He was requested to drive to New Orleans in a company car for a meeting with his superior. After the meeting, the employee engaged in personal activities for a few hours and then was driving back toward the jobsite when he was involved in the accident which caused his death. The court held the employee had completed his personal pursuits and was once again acting in the interest of his employer when the accident occurred.
In the present case the trip was clearly in the interest of the employer. Plaintiff was on call 24 hours a day and one of the purposes of keeping the truck at his home was to have it readily available for use on service calls. Also, plaintiff was leaving for Cameron early the next morning. About 20 minutes driving time would be saved, since plaintiff's home is on the route between New Iberia and Cameron.
The only serious issue arises from the fact that the trip home was at an unusual time. Considering all of the circumstances, we think the contract of employment reasonably contemplated that plaintiff would occasionally drive the truck from the shop to his home at times other than immediately after working hours. No restrictions were made by the employer on plaintiff's use of the truck. He was free to drive it home whenever he pleased.
Defendant relies on Gathright v. Liberty Mutual Insurance Company, 157 So.2d 242 (3rd Cir.1963) in which the employee was a dump truck driver on a highway construction job. During the winter months, the job was shut down but the employee was retained and furnished a pickup truck to maintain the equipment, set out flares for the night and drive to and from his home. On the Saturday night in question, he had picked up several friends and gone to a bar where they consumed alcoholic beverages. When they left the bar, they had difficulty starting the truck. The employee was standing between the truck and a brick wall when one of the passengers inadvertently started the truck forward crushing the employee against the wall. The principal argument was that the employee was "stand-by duty" 24 hours a day. This contention was rejected on the factual finding that there was never any need or occasion to call the decedent at night because there was nothing further for him to do after putting out the flares in the afternoon. Alternatively, claimant took the position that in starting the truck the employee intended to drive it to his home to protect it against theft or vandalism and hence was within the course of his employment. This argument was rejected on the basis that the employee's principal purpose in getting the motor started was to provide transportation for his guests and himself from the bar to their respective homes. Under all of the circumstances, the court concluded the employee was engaged in a purely personal mission not contemplated by the contract of employment.
We find the Gathright case distinguished. In Gathright the employee was not on call 24-hours a day and was not, at the time of the accident, returning to his home. In the present case, the employee was on call 24-hours a day and was actually on his way home in transportation furnished by his employer.
Defendant also contends the court in the present case failed to follow the tests set out by our Supreme Court in Kern v. Southport Mill, 174 La. 432, 141 So. 19, which are: "(1) Was the employee then *910 engaged about his employer's business and not merely pursuing his own business or pleasure; and (2) did the necessities of that employer's business reasonably require that the employee be at the place of the accident at the time the accident occurred?" As to the first test, we find, for the reasons set out above, that the employee was engaged in his employer's business. With regard to the second test, it is clear that the employee was required to be at the place of the accident, i.e., the route from the shop to his home. The time of the accident was different from the usual time that the employee drove the truck home. Nevertheless, as stated above, we think the time of the accident was reasonably contemplated by the contract of employment.
Considerable evidence was introduced on the issue of the employee's intoxication at the time of the accident. Defendant does not urge intoxication as a defense to the claim for compensation benefits. It contends the drinking activities corroborate the argument that plaintiff and his wife were on purely personal drinking party, rather than engaged in the employer's business. We find the record supports the trial judge's conclusion that the defendant failed to prove intoxication. Furthermore, at the time of the accident, plaintiff had ended his drinking activities and was engaged in the course of his employment.

TOTAL AND PERMANENT DISABILITY CAUSED BY DIPLOPIA
The next issue is whether the claimant is totally and permanently disabled as a result of diplopia (double vision). The evidence shows that immediately after the accident on April 6, 1969, plaintiff was seen by Dr. Joseph L. Comeaux, a general practitioner in New Iberia. He found the laceration of the scalp caused a complaint of the eye, for which condition he referred plaintiff to Dr. Ralph Finley, an eye specialist in New Iberia. Dr. Finley first saw plaintiff on April 11, 1969 and diagnosed diplopia, caused by an injury to the fourth cranial nerve which supplies the left superior erector muscle of the left eye. He later did a complete ophthalmological evaluation on September 10, 1969, shortly before the trial of this case on October 22, 1969. It was Dr. Finley's opinion, as of the date of his examination of September 10, 1969, that plaintiff still had diplopia of the downward right gaze and that this condition is disabling for work which requires climbing and the hoisting of heavy equipment in and out of boats. Dr. Finley explained that if plaintiff looked down and to the right he would have double vision and this would be very hazardous in the type of work he was doing.
Dr. Comeaux also referred plaintiff to Dr. Robert Rivet, a neurosurgeon, who confirmed the diagnosis of weakness in a cranial nerve resulting in diplopia. Dr. Rivet last saw plaintiff on April 21, 1969, at which time he felt progress was good.
On July 31, 1969, plaintiff was seen by Dr. John D. Jackson, a neurosurgeon at Oschner Clinic in New Orleans. He diagnosed weakness of the third cranial nerve with diplopia. This physician recommended that plaintiff return to Dr. Griffin for further treatment and, if the nerve weakness did not disappear within 12 to 18 months, surgical treatment would be indicated. Dr. Jackson further explained that most patients with his condition recover in about one year, but if they do not, then surgery should be considered.
Dr. Carlton C. Griffin, an ophthalmologist in Lafayette, first saw plaintiff on June 10, 1969. He was the treating physician. At the time of his first examination he found diplopia in all four quadrants of gaze. On September 22, 1969, plaintiff had improved to the point where he had diplopia only in the right lower gaze. Dr. Griffin says the prognosis for complete recovery is good, but at the time of his deposition, September 23, 1969, it had been less than five months since the accident and the only thing to do was to watch plaintiff's progress. If he did not recover completely within a year, then the nerve injury may *911 never heal and surgery should be considered. As to disability, it is Dr. Griffin's opinion also that plaintiff should not return to the work he was doing because of the hazard involved from double vision. Dr. Griffin explained that if plaintiff had lost an eye he would have required about six months to adjust his vision and then possibly could have returned to work. However, with diplopia you must simply take your time and see how the patient progresses.
Under the expert medical testimony discussed above, we have no difficulty in concluding that, at the time of the trial of this matter on October 22, 1969, plaintiff was still permanently and totally disabled. It is true that Dr. Griffin and Dr. Jackson thought plaintiff would recover within a few months after the trial. However, they also said plaintiff may not recover in that time and may never recover without surgery.

PLAINTIFF'S FAILURE TO CALL MEDICAL WITNESSES
We will next consider defendant's contention that plaintiff failed to call as witnesses several doctors who saw him and that a presumption arises that their testimony would be adverse to plaintiff. The doctors referred to are Drs. Joseph C. Mousseaux, a general practitioner, who apparently saw plaintiff in addition to Dr. Comeaux. Also Dr. J. J. Burdin, an eye specialist and Dr. Edwin G. Burleigh, an associate of Dr. Jackson at Oschners Clinic.
In Evers v. State Farm Mutual Automobile Insurance Company, 187 So.2d 217 (3rd Cir.1966) we stated the rule that although a presumption arises that the testimony of doctors who saw the plaintiff and were not called by him to testify would be unfavorable, such a presumption is merely a factor to be considered along with the other evidence in determining the true facts. The presumption alone is not sufficient to outweigh or overcome the positive testimony of the other physicians who did testify. In this case there is ample positive testimony by physicians who saw and treated the plaintiff to establish the medical facts which support our decision, regardless of the presumption that those physicians who were not called to testify would have given statements unfavorable to plaintiff.

DISABILITY FROM TRAUMATIC NEUROSIS
The final issue is the contention raised in plaintiff's answer to the appeal that he should be found disabled as a result of traumatic neurosis. Plaintiff continued to complain to Dr. Comeaux of chest pain but this physician could find no basis for these complaints. He suggested that Bouttee see a psychiatrist. Accordingly, plaintiff was examined by Dr. Louis Alvarez, a psychiatrist of New Iberia. He saw plaintiff only one time and then for about an hour. This physician opined that plaintiff was suffering from traumatic neurosis. In a well considered written opinion the trial judge thoroughly considered this issue and concluded that traumatic neurosis was not proved. The trial judge stated that the examination by Dr. Alvarez was "simply too short to be used for such a conclusive diagnosis."
Our jurisprudence is established that due to the nebulous character of "traumatic neurosis", courts must proceed with utmost caution and scrutinize carefully evidence in support of such a claim. Jackson v. International Paper Company, 163 So.2d 362 (3rd Cir. 1964). We affirm the trial judge's finding that a disabling traumatic neurosis has not been proved in the present case.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendant appellant.
Affirmed.
HOOD, J., dissents, being of the opinion that plaintiff was not in the course of *912 his employment when the injury was sustained.
On Application for Rehearing.
En Banc. Rehearing denied.
HOOD, J., is of the opinion a rehearing should be granted.
TATE, J., not participating.