269 So.2d 609 (1972)
Presley Carl MUSE, Plaintiff-Appellee,
v.
SENTRY INSURANCE COMPANY et al., Defendants-Appellants.
No. 3900.
Court of Appeal of Louisiana, Third Circuit.
August 4, 1972.
Rehearing Denied September 13, 1972.
Dissenting Opinion September 18, 1972.
Writ Refused October 26, 1972.
*610 Stafford, Pitts & Bolen, James A. Bolen, Jr., Alexandria, for defendants-appellants.
Kramer & Kennedy by Bernard Kramer, Alexandria, for plaintiff-appellee.
Before FRUGÉ, HOOD and DOMENGEAUX, JJ.
FRUGÉ, Judge.
This is an appeal from a workmen's compensation suit wherein plaintiff, Presley Carl Muse, was awarded compensation under LSA-R.S. 23:1221(4) (p) for the loss of the senses of taste and smell. Plaintiff has answered the appeal asking for a declaration of total and permanent disability due to traumatic neurosis. The only question before this court is whether *611 and to what extent plaintiff is entitled to compensation based on an injury admittedly received while on the job. We amend to award total and permanent disability benefits on the basis of traumatic neurosis. Therefore, we pretermit questions of recovery under LSA-R.S. 23:1221(4) (p).
At the time of his injury Mr. Muse, a 25-year-old married man, was employed as a dry cleaner by Alexandria Steam Laundry in Alexandria Louisiana. On July 13, 1970, while at work, he was attacked by a fellow worker and beaten viciously about the face and head. His head was beaten against a brick wall and when pushed to the ground he hit his head upon a concrete floor. Mr. Muse was rushed to the emergency room of Baptist Hospital where he was admitted as a patient.
He remained in an unconscious or semiconscious state for four days, vomiting profusely and occasionally vomiting up quantities of blood. When his wife saw him on the day of the attack she testified, "Well he didn't even know methey had a pan beside of his head and he was spitting up black, clotted looking blood . . .". Upon regaining consciousness he was informed that he had come close to dying. Muse was discharged after seven days.
Plaintiff was first seen by Dr. Albert L. Rayburn, a general practitioner, who treated him on the day of the injury and during his stay in the hospital. Dr. Rayburn was not called at trial but his report was placed in the record.
He examined plaintiff for physical injury only and diagnosed his problem as a slight depressed skull fracture with cerebral concussion. Plaintiff complained of headaches the entire time he was in the hospital and when seen on July 27, 1970, was still complaining of headaches. Neurological and funduscopic examinations were negative. Dr. Rayburn admitted that as of this last visit he could not determine whether there was any permanent damage.
On August 3, 1970, Mr. Muse was seen by two neuro-psychiatrists, Dr. W. Sidney Easterling and Dr. Davidson H. Texada. Dr. Texada was called at trial by defendant, but both Dr. Easterling's and Dr. Texada's reports were placed in the record.
Plaintiff was first seen by Dr. Easterling who recorded complaints of frequent mild to severe headaches in the frontal and left temporal regions. These headaches were "somewhat relieved" by aspirin. Plaintiff was described as cooperative.
Dr. Easterling stated that at this time it was too early to be definite about plaintiff's prognosis. He sent plaintiff to Dr. Texada (practicing at the same address) for "future neurological evaluation". His main concern at this time was a blood clot.
Dr. Texada saw the plaintiff on August 3 and August 14, December 2 and December 16, of 1970; and January 4, January 14, and July 21, of 1971. At trial Dr. Texada admitted that the only thing he looked for on August 3 was a blood clot. His written report of that date shows that plaintiff complained of headaches. At that time the diagnosis was acute closed head injury. On August 14, Dr. Texada saw plaintiff only briefly in order to inform him that the findings of an electro-encephalogram were normal.
Further neurological examinations were conducted on December 2, 1970, and plaintiff was given Fiorinal for his headaches. These headaches continued and on December 16, Dr. Texada prescribed Talwinit did not give plaintiff relief. On January 4, 1971, Dr. Texada placed plaintiff on Equagesic in an effort to curb these headaches but to no avail. On January 13, 1971, the headaches were continuing but no neurological abnormalities could be found. In his written report of January 21, 1971, Dr. Texada stated:
"This patient has continued to complain of headaches since the head injury this past summer. No medication has been of any value."
Dr. Texada described the plaintiff as intellectually limited but cooperative.
*612 On July 21, 1971, after suit had been filed, Dr. Texada again saw plaintiff and submitted a report to defendant's attorneys based on that examination. In this report Dr. Texada stated that plaintiff complained of occasional headaches directly related to periods of exertion or overheating. These pains were controlled by ordinary analgesics. Dr. Texada testified in court that there was never any indication of traumatic neurosis on any of the examinations conducted by him. However, Dr. Texada never conducted any psychiatric examinationsall of his tests were of a neurological nature designed to discover objective symptomatology. The only mention of traumatic neurosis ever made in any of his reports was the denial of the existence of such a condition in his last report (July 21, 1971). It is interesting to note that this single mention of neurosis was made without benefit of a supporting psychiatric examination and only after Dr. Texada had been put on the spot by recommending plaintiff's return to work and defendant, relying thereon, had ceased paying benefits and been sued on this claiman infirmity apparently overlooked by Dr. Texada. Dr. Texada admitted in court that his finding of no traumatic neurosis was based solely upon his reading of a written report by Dr. James H. Phillips wherein Dr. Phillips had stated that plaintiff did suffer from traumatic neurosis.
The report and sworn deposition of Dr. James Harper Phillips were introduced into evidence by plaintiff. Dr. Phillips, a medical doctor with a speciality in psychiatry, graduated from medical school in 1959 and has specialized in psychiatry for one and a half years.
In response to direct questions on cross examination he stated that his examination was more than adequate to support his diagnosis or he would not have made it.
Dr. Phillips set forth the following basic definition of traumatic neurosis:
"Traumatic neurosis is an emotional disorder that occurs most often in a basically emotionally dependent person following rather severe emotional or physical trauma."
Dr. Phillips explained that people who become very dependent on meaningful people in their lives and who, through a lack of intellectual ability have difficulty in handling their anxiety, are prime candidates for traumatic neurosis, especially if they are confronted with a life-threatening situation.
The manner in which trauma works on such a person to produce neurotic pain was set forth by Dr. Phillips thusly:
". . . a person who is basically emotionally dependent, they are in need of emotional support, and especially a person like this, like this man (referring to plaintiff), who has a limited intellectual ability to cope with stress of any type, lives in a rather insecure situation, and they are able to cope with it fairly well until some trauma comes along. This heightens their feeling of insecurity and uncertainty, and then any time they are in a position . . . not any time, but frequently when they are in a position of emotional stress, or physical stress, where they feel less capable of coping with it, they are likely to develop anxiety. Anxiety, or tension, as many people call it, can result in a rather severe headache, and the headache serves as an unconscious manifestation of the conflict, and it serves as an escape route. It offers them a way to get away from their conflict. . . . This is involuntary." (Comment added).
Of Mr. Muse, Dr. Phillips said, ". . . his basic personality is the type that we most often see in the traumatic neurosis, . . . . He had the premorbid personality for a traumatic neurosis. . ." Dr. Phillips enlarged upon these statements by saying that the plaintiff had such an intense emotional dependency on his parents that he lived in a trailer in their back yard even after seven and one-half *613 years of marriage. Also, plaintiff is of lower than average intellectual ability.
It was Dr. Phillips' firm opinion that plaintiff's headaches are due to traumatic neurosis. As to the causal relationship between the neurosis and the attack, Dr. Phillips stated:
"In my opinion the traumatic neurosis that he demonstrated when I saw him was the result of a combination of his preexisting personality and the precipitating event of July 13 when he was traumatized, with some additional sort of `nailing on the lid', . . . occurring when he woke up to be told how close to dying he came. . . . Whether it was physically life-threatening was unimportant. Emotionally to him it was."
Dr. Phillips stated that at the time of the visit, plaintiff was disabled and that due to the fact that plaintiff's low intellectual capability made him a poor candidate for psychotherapy, his prognosis for the immediate future was not good. The doctor stated that this neurosis and the resultant recurrence of symptoms (headaches) is a persistent problem, and that if plaintiff is placed in any situation of stress until he has regained a great deal of his stability, the neurosis will result in a ". . . precipitating headache, or some symptom". For these reasons, Dr. Phillips does not believe that plaintiff will be able to resume his old job or any job that has any stress associated with it. This disability could last for an undeterminable period of time. (Plaintiff was still having headaches at the time of the trial).
We, like the trial court, find Dr. Phillips' report ". . . imminently believable and. . . a lucid explanation of the nature of this type of neurosis . . ."
The only other doctor to examine plaintiff was Dr. Joseph Villard. However, his testimony relates only to plaintiff's loss of smell and taste and therefore, will not be considered.
Defendant would have this court believe that there is a conflict in expert medical testimony between Doctors Texada and Phillips. Indeed, it would be of great inequitable benefit to defendant if we would so find, but we do not. Dr. Texada never performed a psychiatric examination on plaintiff. All of the examinations conducted by Dr. Texada were of a neurological variety designed solely to detect objective findings. Dr. Texada himself admitted that the basis of his July 21 determination was based not on examination conducted by himself but rather the report (not even the excellent deposition) of Dr. Phillips. Having conducted no psychiatric examination, we find that Dr. Texada was not in a position to have accurately evaluated plaintiff's condition. Unsubstantiated findings cannot be the equivalent of those well substantiated (especially true here in view of the fact that it was stated by counsel for defendant and substantiated by Dr. Phillips that an accurate psychiatric diagnosis must be based on a lengthy interview consisting of precisely formulated questions). Therefore, we find Dr. Phillips' testimony uncontradicted.
Defendant also wishes this court to employ a legal presumption against plaintiff arising out of his alleged failure to call several material witnesses (doctors) or explain their absence.[1] Defendant states *614 that in such a circumstance the presumption arises that the statements of each of these doctors would have been unfavorable to plaintiff. However, as defendant points out in his brief, the only inference that could be drawn would be in relation to plaintiff's claim for loss of smell and taste since these doctors (Dr. Easterling and Dr. Rayburn) examined plaintiff only for objective symptomsone being certain fractures which, if found, would substantiate plaintiff's claim as to loss of these sentences. Therefore, no inference could possibly be drawn adversely to plaintiff's claim of disability due to traumatic neurosis.
In any event, had defendant alleged the extension of such inference to plaintiff's neurosis claim, our decision in Evers v. State Farm Mutual Automobile Ins. Co., 187 So.2d 217, 222 (La.App.3rd Cir., 1966), would be dispositive of the issue in plaintiff's favor.
"although this unfavorable presumption is a factor to be considered with the other evidence in determining the true facts, it alone is not sufficient to outweigh or to overcome the positive, sworn testimony of the examining and treating physicians whose testimony was obtained and produced at the trial."
The bulk of "sworn testimony" produced at trial and relied upon by us in Evers, supra, was the sworn depositions of three doctors. Presently, we have the uncontradicted sworn deposition of an examining physician, Dr. Phillips, which heavily outweighs any possible adverse inference.
Louisiana allows awards of compensation for disability resulting from neurosis caused by an injury in the course of employment. Tate v. Gullett Gin Company & Liberty Mutual Ins. Co., 86 So.2d 698 (La.App. 1st Cir., 1956) and cases cited therein at p. 702. There is no necessity that there also be a physical disability. Harrell v. Delta Drilling Company, 251 So.2d 97, 100 (La.App. 3rd Cir., 1971); writs refused, 259 La. 896, 253 So.2d 221 (1971).
As to the matter of proof it is said that there should be a sound cause and good reason for the mental condition which superinduces a fear of pain in the individual strong enough to render him totally disabled. Mouton v. Gulf States Utilities Co., 69 So.2d 147 (La.App. 1st Cir., 1953); Stanford v. Long & Wolfe, 199 So. 608, (La.App. 1st Cir., 1941). In other words, the neurosis should be directly traceable to the accident. Lala v. American Sugar Refining Co., 38 So.2d 415 (La. App.Orl., 1949); Porter v. W. Horace Williams Co., 9 So.2d 60, 63 (La.App. 2nd Cir., 1942). We are convinced that the brutal attack suffered by plaintiff is sufficient in nature to produce the claimed neurosis, and that the attack is in fact, the cause of the neurosis.
It is also said that any claim based on traumatic neurosis must be substantiated by competent psychiatric opinion. Jackson v. International Paper Company, 163 So.2d 362 (La.App. 3rd Cir., 1964). We have previously held that the uncontradicted testimony of one psychiatrist based upon a single psychiatric interview is sufficient. Guidry v. Michigan Mutual Liability Company, 130 So.2d 513 (La.App. 3rd Cir., 1961). See also: Webber v. Wofford-Brindley Lumber Company, 113 So.2d 23 (La.App. 1st Cir., 1959). We, therefore, find Dr. Phillips' testimony sufficient to meet this requirement.
Finally, it is often stated that:
"When a compensation claim is predicated upon traumatic neurosis . . . the court must proceed with utmost caution and exercise extreme care in view of the nebulous characteristics of such a condition. The evidence in cases of this nature should be scrutinized carefully and every precaution should be taken to protect employers and insurers against unjustified claims based on alleged mental *615 affections. On the other hand, the danger of denying recovery to a deserving claimant is equally as apparent, and must be guarded against." (Emphasis added). Jackson v. International Paper Company, 163 So.2d 362, 365 (La.App. 3rd Cir., 1964).
Of note also is the following statement:
"We adhere to the principle that great weight must necessarily be given to the statement of the claimant . . . Where the diagnosis and opinion of the doctor as to the nature and extent of the injury must depend largely on subjective symptoms, if there is nothing in the record to doubt the veracity and honesty of the plaintiff." (Emphasis added). Dixon v. W. Horace Williams Co., 8 So.2d 724, 727 (La.App. 1st Cir., 1942);
and the principle set forth in Miller v. United States Fidelity and Guaranty Co., 99 So.2d 511, 516 (La.App. 2nd Cir., 1957):
"The principle that courts will stigmatize a claimant as a malingerer only upon positive and convincing evidence justifying such a conclusion is so well imbedded in our jurisprudence as to preclude the necessity for specific citations."
None of the doctors ever doubted that plaintiff had genuine headaches. (Dr. Texada even prescribed several medicines for them). All the doctors characterized the plaintiff as cooperative and Dr. Phillips specifically testified that he had extreme confidence in plaintiff's veracity. The trial court apparently had faith in plaintiff's truthfulness as it awarded recovery on the highly subjective complaints of loss of smell and taste. Plaintiff had never made a workmen's compensation claim before, and we like everyone else, have confidence in plaintiff's veracity.
We, therefore, find that plaintiff suffers from traumatic neurosis caused by a work-related injury. The trial court had also found this to be the case, but had not awarded compensation because it did not believe plaintiff was disabled thereby. This was error. Due to the fact that this condition prevents his return to any employment involving stress and that the duration of this disability is impossible of determination, we find that he is totally and permanently disabled. Porter v. W. Horace Williams Co., 9 So.2d 60, 63 (La.App. 2nd Cir., 1942). He is to be compensated accordingly. However, if for any reason his condition should improve in the future, defendant may seek a modification of this decree. Doucet v. Ashy Construction Co., 134 So.2d 665 (La.App. 3rd Cir., 1961).
Plaintiff's claim for penalties and attorney's fees is rejected.
"Mere failure to make payment does not subject an insurer to penalties and attorney's fees even though it may be later found that the payments were due. The failure to pay must be arbitrary, capricious, or without probable cause, and there must have been a demand for the payment. (Emphasis of court cited). Pharr v. Insurance Company of North America, 200 So.2d 365, 370 (La.App. 4th Cir., 1967).
In this case, compensation had been terminated on the basis of a doctor's report and suit followed without a demand for resumption of payments. The same is true of the case before us. After compensation benefits were stopped, plaintiff initiated suit without making a demand for payment.
For the reasons assigned, the judgment of the trial court is amended to award plaintiff compensation benefits on the basis of total and permanent disability subject to a credit in favor of defendants for all previous payments made. The record shows that at the time of the assault, plaintiff was earning $72.00 per week. Therefore, payments to him are to be at the rate of $46.80 per week for a period not to exceed 500 weeks. All costs of this appeal are assessed to defendant-appellant.
Amended and rendered.
*616 HOOD, J., dissents being of the opinion that the judgment of the trial court is correct.

On Application for Rehearing
Rehearing denied.
HOOD, Judge (dissenting).
I respectfully dissent from the majority's refusal to grant a rehearing in this case.
The record contains the testimony and reports of a neuro-psychiatrist, the report of a psychiatrist and a report and deposition of another psychiatrist. The neuro-psychiatrist was plaintiff's treating physician. Each of the psychiatrists examined Muse once. The trial judge accepted the opinions expressed by the treating neuro-psychiatrist and one of the examining psychiatrists, and concluded that plaintiff did not sustain a traumatic neurosis as a result of the accident. My colleagues have reversed this factual finding of the trial judge, and have held that plaintiff did sustain a traumatic neurosis.
Plaintiff's treating physician was Dr. Davidson H. Texada, Jr., who has been practicing in the field of neurology and psychiatry in Alexandria for 24 years. The record contains a number of reports which he submitted while he was treating plaintiff, and he is the only expert in the field of psychiatry who appeared and testified at the trial. My colleagues do not question Dr. Texada's competency or thoroughness, but they have rejected his testimony solely because they concluded that he had made a neurological, rather than a psychiatric, examination of plaintiff. I think they erred grossly in making that assumption. The record itself shows differently, and defendants have attached to their application for rehearing additional, and I think irrefutable, proof that Dr. Texada made a psychiatric examination of plaintiff for the specific purpose of determining whether he had a traumatic neurosis.
The accident occurred on July 13, 1970. Plaintiff, a resident of Rapides Parish, was treated by Dr. Albert L. Rayburn, a general practitioner of Pineville, from that date until July 27, 1970. Dr. Rayburn's report indicates that by the last mentioned date, "neurological and funduscopic examinations were negative," and that plaintiff had recovered from all of his injuries, except that "he still complained of headaches and occasional diplopia." Because of these complaints, plaintiff was referred to Dr. Davidson H. Texada, Jr., for neurological and EEG tests to be done.
Shortly thereafter plaintiff was sent by his own attorney to Dr. W. Sidney Easterling, a psychiatrist practicing in Alexandria, who examined Muse on August 3, 1970. Dr. Easterling reported that plaintiff "was referred by his attorney for neuro-psychiatric consultation." The majority fails to mention, and they apparently overlooked the fact, that a psychiatric examination was made by Dr. Easterling, an experienced psychiatrist, on the above mentioned date, with the result that he found no evidence of any psychotic or emotional disturbance at all. The doctor submitted a formal report to that effect to plaintiff's attorney. And, since the doctor had ruled out traumatic neurosis as a basis for plaintiff's complaints, he referred Muse to Dr. Texada (as Dr. Rayburn had done) for neurological examination to determine whether there was some other cause of his symptoms.
Even if the majority is unwilling to accept the testimony of Dr. Texada, it seems to me that Dr. Easterling's report alone is sufficient to support the judgment of the trial court.
Dr. Texada examined plaintiff initially on August 3, 1970, and concluded that he had an "acute closed head injury with normal neurological examination." In the report which Dr. Texada submitted (solely to plaintiff's attorney) following that initial examination, he noted that Muse "complained of headaches which are not severe. . . ." I agree that the first examination made by Dr. Texada on August 3, 1970, was primarily to determine whether plaintiff had any neurological difficulties. The record does not show the difference between neurological and psychiatric examinations, *617 however, and it seems logical to me that when a specialist in neurology and psychiatry examines a patient, primarily for neurological causes, he incidently must discover something about the patient's mental or psychic condition. The neurological examination, at least, should indicate whether a psychiatric examination would be helpful. Actually, I find nothing in the record or in the majority's opinion which indicates that "traumatic neurosis" is outside the field of a neurologist, or that such a condition cannot be detected by a neurological examination.
This suit was filed on August 26, 1970, about three weeks after plaintiff had received the above mentioned medical reports. It is understandable, in view of these reports from his own doctors, that plaintiff did not allege in his original petition that he suffered "traumatic neurosis" as a result of the accident.
Dr. Texada treated plaintiff for several months from and after August 3, 1970. The treatment obviously was of a psychiatric nature, because he found no neurological abnormality at any time. On December 2, 1970, Dr. Texada noted that plaintiff "continues to have headaches but they are less severe. . . ." On January 21, 1971, he reported that plaintiff has continued to complain of headaches, but that "It is my opinion, at this time, that this patient is capable of returning to employment and I see no indication of any permanent disability."
Following this last report, plaintiff was referred by his counsel to Dr. James Harper Phillips, a psychiatrist practicing in Shreveport, Louisiana. Dr. Phillips completed his specialty training on February 28, 1970, and he thus had been engaged in the practice of psychiatry for only one year before he examined plaintiff on March 2, 1971. He concedes that he is not "board-eligible" under the standards of the American Psychiatric Association, and that he will have to practice in that field at least one more year before he would even be permitted to take the tests required for board approval.
Dr. Phillips examined plaintiff on only one occasion, for a period of one hour, almost eight months after the accident occurred. He found no physical disorder, except for a partial loss of smell and taste, but he concluded from the history which plaintiff gave to him that he had a traumatic neurosis which caused him to have headaches which would disable him from work. I do not feel that Dr. Phillips' opinion should be accepted for several reasons.
In the first place, plaintiff did not give Dr. Phillips a correct or complete history. He did not tell the doctor, for instance, that he had been treated by a neuro-psychiatrist for several months and had been discharged by that specialist before he saw Dr. Phillips. Neither did he tell Dr. Phillips that he had filed this suit, and that the suit was pending when the above mentioned examination was made. The doctor conceded that this additional information would have been material in making a psychiatric evaluation of plaintiff.
Secondly, I interpret Dr. Phillips' testimony to be that plaintiff's supposed disability is due largely to an emotional or a personality problem which he had had for many years, and which is in no way related to this accident. He stated that Muse has a low intellectual level, that he is incapable of coping with stress of any type, that he is emotionally dependent upon his parents to the extent that he will not leave them, and that he has always felt insecure. As I understand the doctor's testimony, this personality trait alone can bring about anxiety and tension which can cause headaches, and which did cause them before this accident occurred.
None of the other doctors felt that plaintiff's headaches were severe enough to disable him. Assuming that they are that severe, however, I still find Dr. Phillips' testimony to be most unimpressive. Plaintiff stated to him that he had never worked since the date of the accident. Dr. Phillips assumes, however, that the stress or strain of working would cause him to have headaches *618 if he tried to work. He bases that conclusion on the fact that when plaintiff has had sexual relations with his wife since the accident he has experienced "the occasional development of headaches because of the exercise during the relationship." Dr. Phillips stated: "I can state only that if working in the laundry adds enough stress to result in the recurrence of his disabling headaches, then the traumatic neurosis is disabling."
The evidence shows that shortly after that examination was made, plaintiff obtained a job "at a horse barn out there taking care of horses, feeding them and when they get through riding them I put them on a walker, call it a cooler, walker, that's all I do, take care of horses, feed, water them and stuff." He has worked at that job since that date, and he earns more there than he did at the time of his injury. He stated "I still have the headaches whenever I get warm," but they obviously do not disable him from performing the duties of his job. It seems to me that he would be subjected to as much stress and strain in his present job as he would have encountered in his work at the laundry.
After being examined by Dr. Phillips, plaintiff amended his petition to allege as an additional ground for his demands that he sustained "traumatic neurosis" as a result of the accident.
In view of this amended petition, defendant had plaintiff examined again by Dr. Texada to determine whether he indeed had a traumatic neurosis.
Dr. Texada performed a psychiatric examination on July 21, 1971, at which time he found that plaintiff had no significant impairment of memory, he was coherent and rational, that "there is no significant anxiety, tension or depression" and that "he shows no psychotic disturbance." Dr. Texada concluded his diagnosis with the following statement: "In my opinion this patient in no way had traumatic neurosis."
In view of these facts, all of which are shown in the record, I am unable to understand how the majority reasoned that Dr. Texada did not conduct a psychiatric examination of plaintiff. The record shows clearly that he conducted such an examination for the specific purpose of determining whether or not plaintiff had a traumatic neurosis.
Attached to the application for rehearing, which defendants have filed in this proceeding, is a letter from Dr. Texada, which reads as follows:
"This is to certify that my examination on the above patient on July 21, 1971 included a psychiatric examination.

"DIAGNOSIS: Head injury, tramatic, with residual impairment of loss of smell.
"In my opinion, this patient in no way had a traumatic neurosis."
Since the evidence and the letter attached to defendants' application for rehearing shows so plainly that Dr. Texada did conduct a psychiatric examination, contrary to the assumption of the majority, defendants request that the case, at least, be remanded to the trial court in order that Dr. Texada may be questioned further as to the nature of the examination which he conducted on July 21, 1971.
I feel that my colleagues have committed at least three errors of law. They have failed to observe the rule that plaintiff must prove his case by a preponderance of the evidence. They have failed to give great weight to the factual findings of the trial judge. And, they have failed to attach more weight to the opinions expressed by the treating physician than to those expressed by equally qualified experts who have had occasion to examine the patient only once or infrequently.
For these reasons I feel that a rehearing should have been granted.
NOTES
[1] Defendant also alleged that plaintiff's failure to call certain lay witnesses alleged to have seen the attack should create an inference that plaintiff was not hit and injured in the areas complained of. This allegation by defendant is also in furtherance of his rebuttal of plaintiff's claim for compensation for loss of smell and taste. Therefore, we find it unimportant to our decision but point out that we have previously held that such inference does not apply to the failure to call lay witnesses who observed the injury. See: Guidry v. Michigan Mutual Liability Company, 130 So.2d 513, 514 (La.App. 3rd Cir., 1961) and Stevens v. Dowden, 125 So.2d 234, 236 (La.App. 3rd Cir., 1960).