382 So.2d 223 (1980)
Ronald JACKSON, Plaintiff-Appellant,
v.
UNITED STATES FIDELITY & GUARANTY COMPANY, Defendant-Appellee.
No. 7445.
Court of Appeal of Louisiana, Third Circuit.
March 5, 1980.
Rehearing Denied April 25, 1980.
*224 Guillory, McGee & Mayeux by Donald Mayeux, Eunice, for plaintiff-appellant.
Caffery, Oubre, Gibbens & Blackwell, John Blackwell, New Iberia, for defendant-appellee.
Before DOMENGEAUX, FORET, and SWIFT, JJ.
DOMENGEAUX, Judge.
This suit results from an intersectional collision which occurred on September 24, 1976, near New Iberia, Louisiana. Ronald Jackson, driver of one of the automobiles, sustained injuries as a result of the accident and sued Wilbert J. Leblanc, driver of the other automobile; Frank Minvielle, owner of the vehicle Leblanc was driving; and United States Fidelity & Guaranty Company (U.S.F. & G. Co.), the insurer of the defendant vehicle.
At the conclusion of the trial held on March 15, 1979, the trial court found that defendants were at fault in causing the accident. This finding by the Court has not been appealed and is not at issue.
The Court took under advisement the question of quantum and subsequently issued reasons for judgment on April 23, 1979, in which it found that the plaintiff had sustained pain, suffering, and anguish in the amount of $5,500.00. The Court also awarded loss of wages at the rate of $600.00 per month for four months, totalling $2,400.00, and found that plaintiff had sustained medical expenses in the amount of $2,492.78. Thus, the award totalled $10,392.78.
The Court refused to award as medical expenses the cost of services rendered by Dr. A. John Tassin in the amount of $245.00, and also refused to allow the cost of physical therapy in the amount of $566.00, which was prescribed by Doctor Tassin. Finally, the trial court assessed all costs against defendants except the expert fee of Doctor Tassin for his testimony in Court. This last fee was assessed against plaintiff. Judgment was signed May 16, 1979. From this judgment plaintiff has appealed.
Plaintiff alleges that the trial court erred in allowing only $10,392.78 for pain and suffering, loss of wages, and medical expenses, and in assessing plaintiff with some expert fees.[1]
*225 OBJECTIVE MEDICAL EVIDENCE
Plaintiff's vehicle was struck on the left, or driver's side, and his injuries were sustained on essentially the left side of his body. In his reasons for judgment, the trial judge found that plaintiff sustained the following injuries:
"The medical evidence is clear that plaintiff received a moderate cerebral concussion and a very mild cervical sprain. He also suffered bruises and lacerations, particularly a laceration below the rear of the left shoulder, which left two or three unsightly keloid formations, each approximately two inches long, in an area usually not exposed to view; a laceration in the left temporal area approximately two inches long which is within the hairline and consequently hidden; and multiple small lacerations of the left arm which have left small, barely noticeable scars."
These injuries are substantiated by the final report of Dr. A. C. Terrence, plaintiff's personal physician, who hospitalized plaintiff for nine days following the accident and treated him from September 27th through November 20th of 1976, before referring Mr. Jackson to an orthopedic surgeon. Dr. J. Frazer Gaar, the orthopedist, examined plaintiff on November 29, 1976, and again on November 22, 1977. Doctor Gaar performed a complete and thorough physical examination during each visit and could find no objective basis to support plaintiff's persistent complaints of headaches and pain to the left side of his body. Doctor Gaar did not think Mr. Jackson had any permanent disability and did not put any limitations on his activities.
After Mr. Jackson's initial visit to Doctor Gaar, his attorney referred him to Dr. Emile Ventre, a general practitioner in Opelousas. Doctor Ventre first saw plaintiff on December 7, 1976. During this visit x-rays of the plaintiff's neck were taken and a general physical examination was conducted by Doctor Ventre. Neither the x-rays nor the examination yielded any objective signs of injury.
Due to Mr. Jackson's continued complaints of headaches and pain to his left side, however, Doctor Ventre suggested that plaintiff undergo a complete workup. Mr. Jackson's attorney agreed. Many tests were performed, including an electroencephalogram, a nuclear brain scan, and an echoencephalogram, or sound wave test. All test results were negative. Plaintiff was discharged from Doctor Ventre's care on January 25, 1977. At that time Mr. Jackson was "feeling very good" according to Doctor Ventre, and had been feeling good for the previous three weeks. On that date plaintiff complained of other pains which Doctor Ventre felt were not related to the accident. Doctor Ventre's final diagnosis was that plaintiff suffered a mild to moderate cerebral concussion with a mild whiplash.
The foregoing medical evidence amply supports the award for actual physical pain and suffering from the date of the accident through January 25, 1977, when Mr. Jackson was discharged by Doctor Ventre. The substantial issue is whether plaintiff suffered a compensable "traumatic neurosis", a functional nervous disorder without demonstrable physical basis, attributable to the accident of September 24, 1976, the effects of which may have continued beyond January 25, 1977. The trial court held that plaintiff's proof was insufficient to establish that a traumatic neurosis occurred as a result of the accident. We reverse that part of the judge's conclusions.

TRAUMATIC NEUROSIS
The trial court correctly observed the well-settled rule that a traumatic neurosis is compensable under our law. However, due to the nebulous character of a traumatic neurosis, courts must proceed with the utmost caution and scrutinize carefully evidence in support of such a claim. Boutte v. Mudd Separators, Inc., 236 So.2d 906 (La.App. 3rd Cir. 1970); Royer v. Cantrelle, *226 267 So.2d 601 (La.App. 3rd Cir. 1972); Miller v. United States Fidelity & Guaranty Company, 99 So.2d 511 (La.App. 2nd Cir. 1957).
However, it is likewise well-settled that the danger of denying recovery to a deserving claimant must be guarded against with equal enthusiasm. Jackson v. International Paper Company, 163 So.2d 362 (La.App. 3rd Cir. 1964), writ refused 246 La. 591, 165 So.2d 484 (1964).

PLAINTIFF'S EVIDENCE OF TRAUMATIC NEUROSIS
In support of his claim for mental injuries caused by the accident, plaintiff offers the expert medical testimony of Dr. A. John Tassin, a general practitioner in Ville Platte, and Dr. James Blackburn, a psychiatrist, as well as the lay testimony of his (plaintiff's) wife, his father-in-law, and a companion who was with him when the accident occurred.
Doctor Tassin saw and treated plaintiff more than twenty times between May of 1977 and March of 1979. Plaintiff complained to Doctor Tassin of the same pains that had plagued him since his accident. During this entire period, Doctor Tassin treated plaintiff symptomatically, that is, he would prescribe medication to treat plaintiff's complaints, even though he could find no objective physical basis for the complaints. Doctor Tassin opined that plaintiff's condition, while more mental than physical, was a result of the accident, even though some of the complaints were not attributable to the accident. Doctor Tassin also felt that the plaintiff was disabled by the accident until at least September 15, 1978, when he allowed plaintiff to return to light work.
Doctor Blackburn examined plaintiff on two occasions, September 5, 1978, and March 6, 1979 (the date on which his deposition, which was used at the trial, was taken). On each occasion, he met with the plaintiff for at least one hour, perhaps longer.
In his testimony Doctor Blackburn recounted at great length the history supplied to him by the plaintiff during the initial visit of September 5, 1978. During the interview, plaintiff had thoroughly familiarized Doctor Blackburn with his pre-accident physical condition (said by plaintiff to be excellent), the accident, and most importantly, the post-accident events. Plaintiff's account of his extensive treatment by numerous doctors (and their subsequent negative findings of any physical injury), as related by him to Doctor Blackburn, was very accurate.
According to Doctor Blackburn, plaintiff felt that by the time he was evaluated by Doctor Blackburn:
". . . he had been to so many doctors, had so many tests and a lot of different messages about what might or might not be wrong with him that he no longer knew whether he was injured in certain areas or to what extent he was injured. He just, in his mind, was still hurting particularly with the headaches. He was willing within reason to undergo any treatment, diagnostic procedure or whatever to alleviate the symptoms. He was going to return to the Mental Health Clinic in Ville Platte for follow-up treatment.[2] His most severe complaint in terms of what was disabling him or caused him the most concern was his degree of tension and anxiety under driving situation and his recurrent headaches which hurt him a lot more if he was under stress, whether there was actual stress or whether he was just worried about his future or his current situation or marriage problems, et cetera."
Based on plaintiff's account of his history before and after the accident, and being fully aware that other doctors could find nothing organically wrong with the plaintiff, Doctor Blackburn stated ". . . my impression would be that he had a significant *227 degree of disability throughout that particular time." At no time did Doctor Blackburn ascribe this disability to a physical injury. To the contrary, he testified that he would have diagnosed plaintiff as an anxiety reaction[3] in September of 1978. Although this diagnosis was made two years after the accident, Doctor Blackburn did not feel that two years was an unusual length of time for such anxiety to continue.
Mr. Jackson, the plaintiff, testified that he continued to experience pain in the left side of his body, severe headaches, and frequent nosebleeds. He also testified that, except for a one and one-half month period between September of 1978 (when Doctor Tassin allowed him to return to work) and March of 1979, he had been unemployed since the accident, although he was regularly employed by T. L. James as an ironworker before the accident.
Plaintiff further testified that, due to his anxiety, he was very reluctant to operate a motor vehicle. Also, his once harmonious relationship with his wife and child had been disrupted due to his irritability, which was brought on by the accident.
Plaintiff's wife, his father-in-law, and his friend, John J. Batiste (the passenger in Mr. Jackson's car at the time of the accident), all corroborated plaintiff's testimony to the extent they were able to do so. None of the testimony of these lay witnesses was refuted, contradicted, or impeached.

DISTRICT COURT'S OPINION

a. Doctor Tassin
In its reasons for judgment, the trial court found Doctor Tassin's testimony unpersuasive. His testimony was given little weight because the first reference to headaches (a primary complaint of plaintiff's) in the doctor's records was on August 23, 1977, more than three months after Mr. Jackson's initial visit,[4] and he first noted spasms in the back on September 13, 1978. Doctor Tassin could not say that either symptom was related to the accident. Still, he felt that many of plaintiff's complaints were attributable to the accident.
The trial court was more impressed by the testimony of Doctors Gaar and Ventre. Doctor Gaar found nothing wrong with Mr. Jackson and, as the trial court noted, he "came close to suggesting that plaintiff may be a fabricator and malingerer." Dr. Ventre had released plaintiff from his care on January 25, 1977, after Mr. Jackson had been "feeling very good" for the previous three weeks.
Clearly the testimony of Doctors Gaar and Ventre was more persuasive in deciding whether or not plaintiff was physically injured. However, we feel that the testimony of Doctor Tassin should have been given more weight by the trial court in deciding whether or not plaintiff was suffering from a neurosis caused by the accident. Doctor Tassin treated plaintiff over a longer period of time22 months than any other doctor, and saw him on more than twenty occasions during that time. Although he prescribed many medications during that time to combat the numerous symptoms of which plaintiff complained, he recognized that many of plaintiff's complaints were of a psychological nature and urged Mr. Jackson to seek psychiatric treatment. Doctor Tassin also testified that he was competent to make psychiatric evaluations since he was a former director of the Ville Platte Mental Health Clinic. Although Doctor Tassin's testimony was accorded little weight by the trial judge, it nevertheless was corroborated by Doctor Blackburn, the psychiatrist.

b. Doctor Blackburn
However, the trial court was unpersuaded by Doctor Blackburn's testimony because (1) his opinion was based on "speculation as *228 to why other doctors did as they did, and not on his own personal medical findings"; (2) he saw Mr. Jackson on only two occasions, one to two hours each time; and (3) he deferred to Doctor Gaar's opinion that a large percentage of plaintiff's complaints were hysterical.
Doctor Blackburn stated that if plaintiff had had the symptoms to get the doctors to do the tests which they did and to prescribe the medication which they did, then his impressions would be that plaintiff had a significant degree of disability, presumably during the entire two year period from the accident to the examination date (September 5, 1978). We feel that the trial court erred in finding that this opinion was based on mere speculation.
Our appreciation of Doctor Blackburn's testimony is that his medical finding that plaintiff was suffering from anxiety reaction was not based on his "speculation as to why other doctors did as they did" but, rather, was based on the fact that plaintiff had, for two years, continuously sought medical treatment from a host of doctors for the pain he was experiencing, despite an absence of objective physical basis for the complaints. As the trial court noted, "Doctor Blackburn testified that if plaintiff thinks he has pain it is the same as if he has it; that when he perceives pain, it is real pain." The fact that other doctors conducted tests and prescribed medication is only evidence that plaintiff felt he was in pain. Consequently, we find that Doctor Blackburn's opinion that plaintiff was disabled for at least two years after the accident is soundly based, and is not mere speculation.
The trial court cited Boutte v. Mudd, supra, for the proposition that a one hour examination is "simply too short to be used for such a conclusive diagnosis" of traumatic neurosis. In Boutte, this court affirmed the trial judge's rejection of a diagnosis of traumatic neurosis because the psychiatrist had seen the plaintiff only one time for about an hour.
The trial court's reliance upon Boutte is misplaced. The court in Boutte had already found plaintiff to be totally and permanently disabled due to diplopia when it considered the issue of traumatic neurosis. After its finding, the court noted in passing that, under the circumstances, the trial court committed no error by finding the psychiatric evidence insufficient.
The rule is well-settled in our jurisprudence that the uncontradicted testimony of one psychiatrist based upon a single psychiatric interview is a sufficient basis to establish the existence of a traumatic neurosis. Royer v. Cantrelle, supra; Muse v. Sentry Insurance Company, 269 So.2d 609 (La.App. 3rd Cir. 1972); Guidry v. Michigan Mutual Liability Company, 130 So.2d 513 (La.App. 3rd Cir. 1961). Doctor Blackburn's diagnosis of anxiety reaction was based upon his first psychiatric interview with plaintiff of one to two hours in length.[5] His testimony was uncontradicted and should have been given greater weight.
We come now to the final reason that the lower court gave for rejecting Doctor Blackburn's testimony. Doctor Blackburn was read the following portion of Doctor Gaar's deposition:
"Q. Generally he complained of pain, Doctor, didn't he, over the whole left neck, left shoulder, left hip and even down to the left leg?
A. Yes. I believe so. Just sort of left body pain. And that's really unusual.
Q. And did you detectis it your field to attempt to detect any psychological overlay a man might have?
A. No.
Q. It is not in your field. Is that what you're saying?
A. Well, sure it is. I see it all the time.
Q. I'm sorry. I misinterpreted the answer.
*229 A. I can tell psychological overlay or hysterical people. Why, this man wasn't hysterical. I don'tif he had paid, either he was lying to me or maybe he is hysterical and really feels that he has pain. However, I'd be willing to say that he does not have the pain rather that he's hysterical and thinks he has it.
Q. I'm not sure exactly what all that
A. Well, you'reeither you're saying the man's malingering or he has a conversion hysteria, and I don't want to say he has either because I'm not qualified and this is quite a burden to put on a man for you to tell him he's a liar or not. All I can say is I could not find anything wrong to substantiate his claim of pain, and I'd like to stay away from the psychological aspects. However, I can sit here and discuss it, you know, fully. But I'm afraid I would lean towards the not believing anything that he said and that's not going to be good for him."
After hearing Doctor Gaar's comments, Doctor Blackburn commented that Doctor Gaar was a good orthopedic surgeon with a well-developed psychological perspective, and stated that if Doctor Gaar "felt that a large percentage of his complaints were hysterical, I would tend to go along with that . . .."
Evidently misconstruing Doctor Blackburn's testimony as a complete agreement with Doctor Gaar's findings, the trial court observed:
"Finally, despite his own opinion, Doctor Blackburn recognizes Doctor Gaar as a good orthopedic surgeon with a well-developed psychological perspective. He would tend to defer to him in such matters."
After carefully reading the testimony, we find that Doctor Blackburn agreed with Doctor Gaar only to the extent that Doctor Gaar thought plaintiff was hysterical. Doctor Blackburn defined hysteria as "an increased level of anxiety or concern." The term "conversion hysteria" has been used synonymously with the term "traumatic neurosis" by this Court. See Royer v. Cantrelle, supra.
To the extent the expert medical testimony of Doctors Gaar and Blackburn may conflict, we will defer to the testimony of Doctor Blackburn, using the same rationale that this Court used in the Muse case and later approved of in the Royer case. The pertinent facts of Muse, as summarized in Royer, are as follows:
"In the case of Muse v. Sentry Insurance Company, 269 So.2d 609 (La.App. 3rd Cir., 1972), we found that the plaintiff should be awarded permanent disability benefits on the basis of traumatic neurosis. The plaintiff had been examined by Dr. Texada, a psychiatrist, who testified that there had never been any indication of traumatic illness, but the court noted that Dr. Texada had never conducted any psychiatric examinations; all of his tests were of a neurological nature designed to discover objective symptoms. His testimony was contradicted by Dr. Phillips, a psychiatrist, who found that Mr. Muse did suffer from traumatic neurosis. The defendant maintained that there was some conflict in expert medical testimony between Doctors Texada and Phillips. We differed with defendant's contention and stated the following:
`Dr. Texada never performed a psychiatric examination on the plaintiff. All of the examinations conducted by Dr. Texada were of a neurological variety designed solely to detect objective findings * * * having conducted no psychiatric examination, we find that Dr. Texada was not in a position to have accurately evaluated plaintiff's condition. * * * Therefore, we find Dr. Phillips' testimony uncontradicted.' (Emphasis ours)."
At several points during his testimony, Doctor Garr admitted that he was not qualified to psychologically evaluate Mr. Jackson; that he wanted to stay away from the psychological aspects of this case; and that his opinion was based only on *230 anatomical or physiological reasons for pain. Further, Doctor Garr conducted no psychological examinations. Consequently, we find that he was not in a position to have accurately evaluated plaintiff's mental condition.
Having first concluded that the testimony of Doctors Tassin and Blackburn should have been given greater weight by the District Court, we now conclude that the preponderance of the evidence is in the plaintiff's favor and that he did suffer a compensable traumatic neurosis.
Doctor Blackburn was the only psychiatrist who testified. He diagnosed plaintiff's condition as an anxiety reaction, a form of traumatic neurosis. The only expert testimony possibly conflicting with the testimony of Doctor Blackburn is that of Doctor Gaar. As demonstrated above, however, the testimony of Doctor Blackburn is more persuasive than that of Doctor Gaar in determining whether plaintiff suffered a traumatic neurosis as a result of the accident.
Additionally, Doctor Blackburn's diagnosis was corroborated by Doctor Tassin and was consistent with the testimony of plaintiff and his lay witnesses. None of this testimony was impeached or contradicted, but was disregarded by the trial court only because none of these witnesses could be said to be completely disinterested, not because he felt as trier of fact that their testimony was not credible.
In many respects this case is similar to Royer v. Cantrelle, supra, and Manshack v. Employers Mutual Liability Insurance Company of Wisconsin, 199 So.2d 579 (La.App. 3rd Cir. 1967). In both cases the psychiatric conclusions that plaintiffs therein suffered traumatic neuroses were supported by uncontradicted lay testimony. This evidence preponderated in plaintiffs' favor and their compensation claims were upheld. The evidence in this case mandates the same result.

QUANTUM
Having determined that the evidence establishes that the accident caused plaintiff to have a traumatic neurosis, we now turn to the issue of quantum. The amount awarded by the trial court must be increased to compensate plaintiff for pain and suffering, lost wages, and medical expenses incurred subsequent to January 25, 1977, the original cutoff date established by the trial judge. Our increase in the amount of the award is not violative of the principles set forth in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977), and Schexnayder v. Carpenter, 346 So.2d 196 (La.1977) since the increase is made to compensate plaintiff for damages at first not believed to be causally related to the accident, not to correct a trial court's abuse of discretion in making an award.
Plaintiff should be awarded an additional $3,000.00 for pain and suffering he experienced from January 25, 1977, through September of 1978. The record shows that plaintiff's pain and suffering was more acute and intense during the four months following the accident, hence his compensation for that time period, as fixed by the trial court, should be greater. After his discharge by Doctor Ventre, plaintiff continued to experience pain which was oftentimes alleviated by prescription medication. We think the $3,000.00 sufficiently compensates plaintiff for his pain and suffering and inconvenience from January 25, 1977, through September, 1978, when Doctor Tassin released plaintiff to return to work.
Plaintiff will be awarded $12,000.00 as loss of wages. This amount is in addition to the $2,400.00 awarded by the trial court. The additional award is arrived at by multiplying $600.00 (plaintiff's average monthly wage as correctly found by the trial judge) by twenty months (the number of months plaintiff was incapacitated by the traumatic neurosis).
Plaintiff is further awarded, as medical expenses, the $240.00 charged by Doctor Tassin in connection with his medical services. Also, the expert witness fee of Doctor Tassin will be taxed as costs payable by the defendant.
*231 The physical therapy bill will not be allowed. Although the physical treatment was prescribed by Doctor Tassin, this Court is not convinced that the atrophy in plaintiff's left leg was caused by the accident.

DECREE
For the above and foregoing reasons, the judgment of the District Court is amended to increase the amount awarded plaintiff to the sum of $25,632.78 and to assess the expert fee of Doctor Tassin against defendants. In all other respects the judgment is affirmed. All costs of this appeal are assessed against defendants.
AFFIRMED AS AMENDED.
SWIFT, J., concurs.
NOTES
[1] Plaintiff also alleged that the Court awarded an insufficient amount for attorney's fees. However, counsel for plaintiff has not briefed this point. Furthermore, there has been no showing that plaintiff is entitled to attorney's fees or that the trial court intended to award attorney's fees. The signed judgment of the Court below was silent as to attorney's fees and this Court, feeling that the allegation was inadvertent, will consider it no further.
[2] Footnote by the Court of Appeal. Before being evaluated by Doctor Blackburn plaintiff had been referred to the Mental Health Clinic in Ville Platte by either Doctor Tassin or by plaintiff's attorney.
[3] Anxiety reactions have been recognized as a type of traumatic neurosis. See Butterworth, THE NEUROSES 1967.
[4] Doctor Tassin remembered that plaintiff's complaints of headaches began when he first saw plaintiff, even though his recollection is not confirmed by his notes.
[5] Doctor Blackburn testified that he would have diagnosed plaintiff as an anxiety reaction after the first interview on September 5, 1978. At the second interview, Doctor Blackburn again saw plaintiff for about an hour and had him undergo 3 ½ hours of psychiatric examinations which revealed no evidence of psychosis or neurosis at that time.