394 So.2d 787 (1981)
Audrey RENFROE, Surviving Spouse of Anthony Polito, Individually and on Behalf of the Dependent Minors, Frank Joseph Polito and Samuel Wayne McLellan
v.
CITY OF NEW ORLEANS, General Motors Corporation and the Royal Globe Indemnity Insurance Company.
No. 12002.
Court of Appeal of Louisiana, Fourth Circuit.
February 5, 1981.
Rehearing Denied March 16, 1981.
*789 Dalton, Gillen & Roniger, Gregory W. Roniger, Jefferson, for plaintiffs-appellees.
Turner & Young, George P. Hebbler, Jr., New Orleans, for defendants-appellants.
Before SAMUEL, GULOTTA and CHEHARDY, JJ.
GULOTTA, Judge.
Defendants, General Motors Corporation and its insurer, appealing from an award of death benefits under the Louisiana Workmen's Compensation Act to the widow of Police Captain Anthony D. Polito, contend there was no proof of an employment relationship between General Motors and Polito. Alternatively, they argue that Polito's fatal automobile accident did not arise out of and in the course and scope of his employment and that the trial judge erred in excluding certain evidence indicating Polito was on a personal mission rather than a job-related activity when he died. Defendants further contend that Polito's intoxication at the time of the accident bars his widow from recovery under LSA-R.S. 23:1081.[1]
Although we agree with the trial court that an employment relationship existed and that the accident arose out of and occurred in the course of Polito's employment, we conclude that Polito's intoxication was the proximate cause of his accident. Accordingly, we reverse the trial court's judgment.

BACKGROUND
For five days prior to his death in the early morning hours of February 2, 1977, Captain Polito was in charge of a special detail of six police officers at the National Automobile Dealers Association convention in New Orleans. Although the officers were New Orleans policemen, they had been specially detailed to protect and escort Buick Motor Division executives during their stay in the city. Each officer, except Polito, was assigned as a chauffeur and bodyguard to a Buick executive or VIP. Polito had the responsibility of overseeing the detail. Each officer, including Polito, was provided with a new Buick automobile *790 for use in carrying out his assignments. Polito and his men were on 24-hour call during the convention period. Often their work would occupy them from 7:30 or 9:00 a. m. until 2 or 3 a. m. the following day as they accompanied the executives at dinner and night spots in the city. Although Polito would coordinate assignments, the record indicates that he was also seen at restaurants with Buick executives during the convention.
At the conclusion of the convention and after the Buick executives had been returned to the airport on the morning of February 1, 1977, Polito and his men met at the Fairmont Hotel during the early afternoon and each officer was paid his earnings. Also at that time, Polito informed them that there would be a dinner for them that evening at a local restaurant. Although some officers returned their loaned cars at that time, Polito exercised an option to return the vehicle on the following day.
The dinner lasted from approximately 6 to 9 p. m. and was attended by the officers in the detail and some Buick personnel. The record indicates that Polito had two glasses of wine with the meal and, after dinner, returned to the Fairmont where he consumed more drinks in the hotel lounge over a period of about an hour. He then went to the hotel night club. Polito was drinking heavily before leaving at approximately 11:30 p. m.
At some time between midnight and 1 a. m on February 2nd, Polito's Buick, while traveling at a high rate of speed in a westerly direction on I-610, hit the curbing and rolled over the guardrail in the vicinity of the 17th Street Canal and I-10 in the city of New Orleans.[2] Police officers arrived between 1:35 and 1:40 a. m. and found Polito dead at the accident scene, approximately six blocks from his home. A blood-alcohol test performed during his autopsy revealed an alcohol content of 0.23%.

EMPLOYMENT RELATIONSHIP
At the outset, we reject defendants' contention that there has been a failure of proof of the employment relationship between Polito and General Motors. Although it is true that a workmen's compensation claimant must prove by a preponderance of the evidence that he was an employee of defendant at the time of his injury,[3] we hold that there was ample proof of the employment relationship in our case.
Robert J. Adams, manager of sales promotion and merchandising of the Buick Division of General Motors at the time of the 1977 convention, testified that he had contacted a former New Orleans police officer, Joe Vitare, to arrange for security for General Motors executives during their stay in New Orleans. Vitare contacted Polito who picked the officers for the detail. Each officer under Polito's command was assigned a General Motors management member from the Buick division. During the convention Polito remained in contact with Adams and oversaw security of the Buick executives. A seven-page bill from Buick's advertising agent to the Buick Motor Division, General Motors Corporation, shows payment in connection with the police detail, made to "Captain Anthony D. Polito." Payment was made by General Motors to the officers for the services rendered by them. This is not a case where the officers were employed by the City of New Orleans or were assigned by the New Orleans Police Department.[4] Under the circumstances, we conclude the evidence established an employment relationship between Polito and General Motors.

ACCIDENT "IN COURSE OF" EMPLOYMENT
In his written reasons for judgment, the trial judge concluded that Captain Polito *791 was acting "within the course and scope of his employment at the time of his fatal accident." The judge noted that Polito was on "24-hour call" on February 1, 1977, even though the officers had been paid in the early afternoon. He further observed that for purposes of the workmen's compensation action the detail extended beyond the time of payment and that Polito's duties as commanding officer would have continued until the detail was completed by his return of the automobile to the Buick dealer on February 2, 1977, even though his duties to escort Buick representatives had ended on February 1. The court was of the opinion that where the employer furnishes an automobile to his employee who has an accident on the way to his home, compensation should be allowed, even though the employee may be diverted prior to returning home.
Defendants contend that the fatal accident did not arise out of or occur in the course of Polito's employment for General Motors. Since the special detail had ended during the afternoon of February 1, and Polito had requested that he be allowed to keep his vehicle until the next morning, the defendants argue that Polito at the time of the accident in the early morning of February 2 was not about his employer's business but rather was returning from a "night on the town". According to defendants, the necessities of the detail did not require him to be at the place of this accident at the time it occurred. They argue that the mere driving of the assigned Buick automobile by Polito at the time of the accident does not automatically prove he was in the course and scope of his employment.
LSA-R.S. 23:1031 provides that compensation shall be allowed for accidental injury "arising out of and in the course of" the claimant's employment. Under the jurisprudence interpreting this statute, it has been held that the terms "arising out of" and "in the course of" are not synonymous but must be considered together. The former phrase suggests an inquiry into the character or origin of the risk, while the latter phrase brings into focus the time and place relationship between the risk and the employment. Lisonbee v. Chicago Mill and Lumber Company, 278 So.2d 5 (La.1973).
in determining whether an accident "arose out of employment", at issue are whether the employee was then engaged about his employer's business instead of merely pursuing his own business or pleasure and whether the necessities of that business reasonably required that the employee be at the place of the accident at the time it occurred. Kern v. Southport Mill, 174 La. 432, 141 So. 19 (1932); Whitney v. U.S. Fid. & Guar. Ins. Co., 373 So.2d 728 (La.App. 2nd Cir. 1979), writ denied, 376 So.2d 320 (La.1979); Blakeway v. Lefebure Corp., 393 So.2d 928 (La.App. 4th Cir. 1981). An accident occurs during the course of the employment when it occurs during the time of the employment and at a place contemplated by it. Lisonbee v. Chicago Mill and Lumber Company, supra; Whitney v. U.S. Fid. & Guar. Ins. Co., supra. A determination whether an employee was engaged in a purely personal endeavor or in the course of his employment depends upon the facts of the particular case. Whitney v. U.S. Fid. & Guar. Ins. Co., supra; Keller v. Wallace Industrial Constructors, 224 So.2d 31 (La. App. 1st Cir. 1969), writ refused, 254 La. 782, 226 So.2d 771.
We have no difficulty in concluding that Polito's accident "arose out of" his employment. Driving the automobile was a responsibility contemplated and carried out in Polito's employment. The risk of an automobile accident was of the character associated with his duties as chauffeur to the Buick executives. He had been entrusted with a Buick automobile for use in that assignment and was permitted to drive it home each night before returning it to the Buick dealer at the end of the detail. The risk of an accident while driving that vehicle was to be expected and we cannot say that the fatality in this case did not arise out of the employment.
A more difficult question, however, is whether the fatality occurred "in the course of" Polito's work for General Motors.
*792 Although it is clear that the officers in the detail were paid on the afternoon of February 1 and that they performed no further duties for the Buick Motor Division in connection with the convention, we conclude that the evening of February 1 at the local restaurant was connected with the detail. Even though Polito suggested having the dinner, Adams, the Buick representative, testified that it is "customary to have dinner with your friends when you get through doing something" and that he had no objections to the suggestion of dinner since "everybody had done a good job." In light of this evidence, we hold that the dinner was part of Polito's employment for purposes of the compensation statute. Indeed, General Motors paid the expenses for the dinner.
The direction of Polito's vehicle at the time of the fatal crash and its proximity to his home indicate that the accident occurred while Polito was attempting to return home following the dinner and the social events at the hotel. Furthermore, Polito's final employment function, i. e., the return of the automobile, would have been carried out on the following day, February 2. Polito at the time of his death was attempting to return home as a step toward returning the vehicle. We consider our case analogous to Boutte v. Mudd Separators, Inc., 236 So.2d 906 (La.App. 3rd Cir. 1970), cert. den., 256 La. 894, 240 So.2d 231 where an employee, subject to call 24 hours a day, was injured while driving his employer's truck home after some personal socializing. That employee was using his employer's vehicle to return home to have it available the following day for his employment. Our case is also similar to Keller v. Wallace Industrial Constructors, supra, in which the evidence indicated that the employee after leaving his employer to engage in his own business was killed while returning either to his home or the job site. The court noted that the employee's heading in the direction of home was "bringing him closer to the completion of his mission, and therefore, coincided with the business purpose." Guided by these cases together with the realization that we are dealing with social legislation, we are led to conclude that the accident arose in the course of Polito's employment.

INTOXICATION
LSA-R.S. 23:1081 denies compensation "for an injury caused ... by the injured employee's intoxication at the time of the injury." The trial judge in his reasons for judgment stated that the employer must show that the employee's intoxication was the cause of the accident. The judge noted that other factors such as fatigue and stress from long hours could have equally contributed to Polito's death and that General Motors had failed to carry its burden of proof showing that the accident resulted from the employee's intoxication. We do not agree with the legal conclusion that defendants failed to carry the burden of showing Polito's intoxication.
The evidence is undisputed that Polito drank about two glasses of wine with the meal at the restaurant on the evening of the accident and continued to drink at the hotel following the dinner. Captain Richard Hunter, an officer serving on the General Motors detail, testified that Polito had "plenty" of champagne cocktails at the hotel lounge during a forty-five minute to one-and-one-half-hour period before moving on to the hotel nightclub, the Blue Room, and drinking heavily there. Hunter said that Polito's speech was slurred and that he appeared very unsteady and tired at that time. He indicated that his intoxication was "real obvious."
Terry Parta, another officer on the detail, testified that Polito was past the "feeling-good" stage when he went into the Blue Room. According to John Morse, also a fellow officer, Polito drank some alcohol at the restaurant and had maybe two or three drinks at the hotel lounge and several more at the Blue Room. Morse felt Polito was "on the way to being intoxicated" at about 10:30 p. m and appeared intoxicated around 11:15 or 11:30 p. m. when the Blue Room show ended. Morse described Polito's speech as slurred. His actions also were impaired. Morse testified further that Polito *793 had fallen asleep at the table during the nightclub show and appeared to be walking like an intoxicated person (not going from side to side but staggering) when he left the Blue Room. Morse indicated an effort was made to escort Polito to wherever he was going, but he refused it.
The investigating police officer who arrived on the accident scene between 1:35 and 1:40 a. m. smelled alcohol on Polito's body. Dr. Paul McGarry, the pathologist who performed the autopsy, also smelled alcohol and requested a blood test, which showed a 0.23 alcohol content in Polito's blood. Dr. McGarry testified that such a blood alcohol level is enough to influence behavior and is legally and medically evidence of intoxication.
Polito's fatal accident was witnessed by Thomas K. Winingder, a motorist who was traveling on I-10 in a westerly direction at the time of the crash. According to Winingder, Polito's late model Buick was moving in a westerly direction on I-610 at a high rate of speed. He saw it hit the curbing, roll over the guardrail and disappear out of sight. Jefferey Reilly, the police officer investigating the accident, found no swerve marks on the roadway or any indication that Polito may have taken an evasive action.
Dr. Monroe Samuels, the chief consulting pathologist for the New Orleans Coroner's office, could not unequivocally say a hypothetical driver with an alcohol level of 0.23% would have an accident under circumstances similar to Polito's as a result of intoxication. However, Samuels did testify that an individual with a 0.23 blood alcohol level is significantly impaired and "would have to be classified as an unsafe driver." This toxicologist, who signed the report relating to Polito's death, indicated that the impairment would be in perception, distance and reflexes. Dr. Samuels stated "he might see something, yet not appreciate exactly what it was that he saw." An individual at a 0.23 concentration would be much more likely to have an accident of this particular nature than one who is sober. Although there was evidence in the record that Polito obtained only a few hours sleep per night during the days preceding his accident, Dr. Samuels indicated that fatigue and alcohol is "an awful mixture that is difficult to divide." He observed that the depressant condition of alcohol may cause a fatigued person to fail to appreciate his inability to drive. Although Polito had suffered a heart attack long before his accident, and had experienced angina attacks, Dr. Samuels was of the opinion that the influence of alcohol would tend to dilate the coronary vessels and work against a coronary spasm as a cause of the accident.
The pathologist, Dr. Paul McGarry, believed that consumption of alcohol contributed to Polito's death. He testified that it was "highly probable that his level of alcohol was instrumental in the occurrence of the accident." Although he recognized that various factors such as fatigue and Polito's heart condition may have been involved, he stated that "putting this case together with all the specifics makes other factors unlikely." He did not expect an episode of angina to be responsible for the accident since such a pain syndrome does not cause such distraction or inattention to such a degree as to cause a driver to lose control of a car totally. Although he recognized that working twelve to fifteen hours a day would be excessive for a man with Polito's heart condition, McGarry did not expect that fatigue alone, with no other factors involved, could have caused the accident, although he acknowledged that it was remotely possible.
Our reading of the undisputed lay and expert testimony in the record leads us to conclude that Polito's intoxication was the "cause" of his fatal accident, even though other factors may have played a part. We hold that the trial judge erred in refusing to recognize intoxication as a defense under these circumstances. The statute denies compensation for an accident "caused by the employee's intoxication"; it does not speak of accidents "solely caused" by the employee's intoxication.[5]
*794 In so holding, we distinguish Ray v. Superior Iron Works and Supply Co., Inc., 284 So.2d 140 (La.App. 3rd Cir. 1973), writ refused, 286 So.2d 365 (La.1973). In Ray the court allowed compensation to an employee with a blood content of 0.26% alcohol, who was injured in a one-car accident after his automobile left an asphalt highway in good weather on a gradual curve. In the cited case, unlike ours, three of plaintiff's witnesses testified that the employee did not appear drunk before driving. Furthermore, the employee testified that as he was coming into the curve he became blinded by the lights of some on-coming cars, pulled off the highway to the right but lost control in trying to bring his car back onto the highway. The Ray opinion noted that the visible evidence at the accident scene did not warrant the conclusion that plaintiff could not have momentarily driven off the right shoulder upon meeting on-coming cars. In Ray it was more probable that the plaintiff had simply run off the road. For a discussion of the Ray case, see Malone, 14 La.Civil Law Treatise: Workers' Compensation, Second Edition § 344.
In our case, however, several witnesses testified that Polito had appeared drunk upon leaving the Fairmont Hotel shortly before his accident. Moreover, the witness to the accident observed Polito's vehicle traveling at a high rate of speed and leaving the roadway for no apparent reason.
Although sympathetic to the widow in this case, we feel compelled to reach the unfortunate conclusion that plaintiff is not entitled to workmen's compensation since the employee's fatal injuries were caused by his intoxication. The defense of intoxication in workmen's compensation cases is indicative of the public policy against allowing recovery where injury has been caused by intoxication. Defendants successfully carried the burden of showing intoxication in this case.
Consistent with the foregoing, we reverse the judgment of the trial court. Accordingly, plaintiffs' suit is dismissed. Costs to be paid by defendants.
REVERSED AND RENDERED.
SAMUEL, J., concurs and assigns reasons.
SAMUEL, Judge, concurring.
I agree with the conclusion reached on the issue of intoxication and with the decree as a result of that conclusion. That issue alone requires the result reached even if the decedent was an employee acting within the course and scope of his employment. Accordingly, in my view, particularly as I am doubtful about the conclusion which properly should be reached on those other issues, I see no reason to consider them.
For the above reasons, I respectfully concur.
NOTES
[1] LSA-R.S. 23:1081 reads as follows (in pertinent part):

"§ 1081. Deliberate or wilful injuries, etc.; defenses; burden of proof.
No compensation shall be allowed for an injury caused ... (2) by the injured employee's intoxication at the time of the injury ....
In determining whether or not an employer shall be exempt from and relieved of paying compensation because of injury sustained by an employee for the causes and reasons set forth in this Section, the burden of proof shall be upon the employer."
[2] Thomas K. Winingder, a motorist traveling on I-10, witnessed the accident. Jefferey Reilly, a New Orleans police officer, arrived on the accident scene.
[3] Geiger v. Larrieu, 246 So.2d 713 (La.App. 4th Cir. 1971); Tew v. Aetna Casualty And Surety Company, 174 So.2d 838 (La.App. 4th Cir. 1965).
[4] By "stipulation of counsel for plaintiff," the claim against the City of New Orleans, named as a defendant in the original petition, was dismissed.
[5] We are aware, however, of jurisprudence holding that the intoxication must be the sole or proximate cause of the employee's accident. See Conley v. Travelers Ins. Co., 53 So.2d 681 (La.App. 2nd Cir. 1951); Dollar v. Southern States Co., 18 La.App. 178, 135 So. 758 (La. App. 2nd Cir. 1931). Even if a sole cause standard is required, we conclude intoxication was the sole cause of the accident in this case.